## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA

UNITED SOVEREIGN AMERICANS, INC.
167 Lamp and Lantern Village
Suite 194
Chesterfield, MO 63017

    *And*

CITIZENS DEFENDING FREEDOM
7901 4TH Street, Suite 300
St. Petersburg, FL 33702

    *And*

JEFFREY BUONGIORNO
3851 North Ocean Blvd. #406
Gulfstream, FL 33483

    *And*

CATHI CHAMBERLAIN
10520 San Fernando Blvd. NE
Saint Petersburg, FL 33702

    *And*

GABRIELLE FOX
3330 Fairchild Gardens Ave., #33663
Palm Beach Gardens, FL 33410

    *And*

CHRISTOPHER GLEASON
1628 Sand Key Estates Court
Clearwater, FL 33767

    *And*

GERRY JAMES
4811 Otter Creek Lane
Ponte Vedra Beach, FL 32082

CIVIL ACTION

Case No.: _____

*And*

JUDITH JENSEN
22714 NW 191st Lane
High Springs, FL 32643

   *And*

JANE JUSTICE
3661 Via Ponciana, #314
Lake Worth, FL 33467

   *And*

MARA MACIE
336 W 6th St.
Jacksonville, FL 32206

   *And*

MICHAEL PETERS
241 Alameda Ave.
Fort Myers, FL 33905

   *And*

DAVID SCHAFFEL
4344 Montalvo Ct.
Naples, FL 34109

   *And*

DARLENE CEREZO SWAFFAR
10 Fairway Drive, Suite 118
Deerfield Beach, FL 33441

                    *Petitioners,*

v.

CORD BYRD, IN HIS OFFICIAL
CAPACITY AS THE SECRETARY OF
FLORIDA

500 S Bronough Street
Tallahassee, FL 32399

FLORIDA DIVISION OF ELECTIONS
500 S Bronough Street
Tallahassee, FL 32399

    *And*

ASHLEY MOODY, IN HER OFFICIAL
CAPACITY AS THE ATTORNEY
GENERAL OF FLORIDA
PL-01, The Capitol
Tallahassee, FL 32399

    *And*

MERRICK GARLAND, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
THE UNITED STATES
950 Pennsylvania Avenue NW
Washington DC 20530

        *Respondents.*

## PETITION FOR RELIEF IN THE FORM OF AN AMENDED WRIT OF *MANDAMUS* [1]

*TO: The Honorable, the Judges of Said Court:*

United Sovereign Americans, Inc., a Missouri nonprofit corporation also incorporated in

Florida as a separate chapter, Citizens Defending Freedom, a Florida nonprofit corporation,

Jeffrey Buongiorno, individually, Cathi Chamberlain, individually, Gabrielle Fox, individually,

Christopher Gleason, individually, Gerry James, individually, Judith Jensen, individually, Jane

Justice, individually, Mara Macie, individually, Michael Peters, individually, David Schaffel,

---

[1] Petitioners are cognizant of Federal Rule of Civil Procedure 81(b) which abolished mandamus actions in United States District Court, but nonetheless authorizes "relief previously available through [writs of mandamus] by appropriate action or motion under these rules." F.R.C.P. 81(b). Petitioners herein are seeking relief via the All Writs Act (§ 1361) and an Action to Compel a United States Officer to Perform His/Her Duty (§ 1361).

individually, and Darlene Cerezo Swaffar, individually, Petitioners, by counsel, van der Veen, Hartshorn, Levin, & Lindheim, through Bruce L. Castor, Jr., Esquire, and Michael T. van der Veen, Esquire, hereby submit this Petition for Relief in the Form of a Writ of *Mandamus*, directed to Respondents, Cord Byrd, in his Official Capacity as the Secretary of the State of Florida, the Florida Division of Elections, Ashley Moody, in her Official Capacity as Attorney General of Florida, and Merrick Garland, in his Official Capacity as Attorney General of the United

States, and,

*Respectfully Represents*:

### Summary of Petitioners' Argument and Examples of Relief Requested

1.      The Congress of the United States has outlined the minimum standards which must be maintained by every state in order for a federal election to be considered reliable.  As outlined below, in Florida's 2022 federal election those minimum standards were not met by Florida election officials rendering the certified election results that year unreliable. Respondents in their official capacities engaged in insufficient efforts to ensure that the 2022 performance is not repeated in subsequent federal elections beginning in 2024.

2.      If the 2022 election performance is repeated in 2024, Petitioners and all Florida voters will suffer damages.

3.      Apart from Court action in equity, no other mechanism exists in the law for Petitioners to require Respondents to perform their ministerial duties requiring that Florida's federal elections be conducted in conformity with the law as Congress has set forth.

4.      Only this Honorable Court has the power to require Respondents to act to bring the 2024 (and subsequent) federal elections supervised by Florida authorities into conformity

with the minimum standards for reliability set down by Congress and outlined *infra*.

5.      Without the Court's action, Petitioners believe and therefore aver that the 2024 (and subsequent) Florida federal election results will be unreliable in the same way, and thus unreliable for the same reasons that the 2022 results are unreliable.

6.      Petitioners seek this Court's intervention to ensure that only properly registered voters cast votes in combined federal and state elections beginning in 2024.

7.      Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and Florida elections beginning in 2024.

8.      Petitioners seek this Court's intervention to ensure that all votes properly cast are counted *correctly* in combined federal and Florida elections in even numbered years beginning in 2024.

9.      Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and Florida elections beginning in 2024.

10.      Petitioners seek this Court's intervention to ensure that all voting systems are compliant with all critical infrastructure requirements and risk assessments are completed within the actual use context, thereby assuring that every ballot is correctly and uniformly processed, as well as accurately tabulated and secured in combined federal and Florida elections beginning in 2024.

11.      Petitioners seek this Court's intervention to ensure that the authenticity of every ballot counted is proven by the maintenance of a comprehensive, unbroken chain of custody from the voter's hand to the final certified result, and the Florida election officials maintain records of said chain of custody post-election, in compliance with all legally prescribed safeguards in combined federal and Florida elections beginning in 2024.

12.     Petitioners seek this Court's intervention to ensure that combined federal and Florida elections in even numbered years beginning in 2024 are conducted with the transparency required by law.

13.     Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and Florida elections beginning in 2024.

14.     Petitioners seek this Court's intervention clarifying and ordering that the currently accepted Federal definition "to certify" is to attest that an official measurement is both accurate and the finding of accuracy was reaching in a fully compliant manner, thereby, directing that the "certification of elections" by Florida election officials of combined federal and Florida elections from 2024 onward constitutes an "attestation," ostensibly under penalty of perjury, by the certifying official(s) that the vote counts are accurate and the cast and counted votes and the election itself were all conducted in compliance with applicable federal and state law.

15.     Petitioners, upon review of the statutes cited below, believe and therefore aver that federal and state law specify what Florida officials must conform to, *at a minimum*, to properly conduct a combined federal and state election and prior certifying that election.

16.     Petitioners believe and therefore aver that based on the analysis below, combined with the various exhibits attached to this petition and incorporated by reference herein, that in the 2022 combined federal and state election, officials of the State of Florida failed to ensure that **safeguards** were in place as mandated by various statutes designed to ensure the integrity of the elections.

17.     Petitioners believe and therefore aver the failure by Florida election officials to know of and implement the safeguards required by law in 2022 allowed Florida election

officials to certify that election despite analysis showing the election results were *per se* unreliable on account of apparent error rates exceeding those the law permits before the results in *any* federal election become unreliable.

18.   Petitioners believe and therefore aver that apparent error rates that exceed the maximum error rate allowed by law destroyed the integrity of the 2022 election making full confidence in the accuracy of that election impossible.

19.   While Petitioners cannot state with certainty that the 2022 Florida General Election produced "winning" candidates who should not have won, Petitioners believe and therefore aver that the State of Florida cannot state with certainty that all "winning" candidates received more votes than their "losing" candidates because the election itself was compromised by the State's failure to conform to the requirements of federal law designed to ensure reliable election results.

20.   Petitioners believe and therefore aver that Congress mandated the maximum number of election errors which were permissible in the 2022 combined federal and state elections in Florida (and, indeed, in all states and voting territories).  An error rate above the maximum permissible rate set by Congress renders an election *uncertifiable* because the results are unreliable.  Nevertheless, Florida officials certified the 2022 election.

21.   Petitioners do not seek relief in this Court in a challenge to the outcome of the 2022 federal election in Florida.  Petitioners agree that it is possible that in every federal contested election supervised and certified by Florida in 2022 the "winner" received more votes than the "loser."

22.   Petitioners believe and therefore aver, however, that the certification by Florida officials of the 2022 election was done despite the integrity of the election being suspect on

account of *apparent* error rates occurring in that election that exceeded the error rate Congress permits before federal election results cannot be relied upon as accurate, and Florida did nothing to investigate those apparent errors before certifying the election.

23.     **Petitioners believe and therefore aver that it is reasonable to believe that systemic issues which occurred in the 2022 combined Federal and state election in Florida will continue uncorrected in 2024, 2026, 2028, etc. absent intervention by this Court.**

24.     Petitioners aver they have called the various issues with the 2022 election to the attention of state officials who failed to take sufficient action to ensure no further repeats of those issues cited here affecting the integrity of the 2022 election.

25.     The relief requested by Petitioners in the form of a Writ of *Mandamus* seeks, broadly speaking, this Court order Respondents to perform the *ministerial* functions their jobs require by taking actions to rectify reliability issues evident in the 2022 election.[2]

### 2022 Combined Federal and State Election in Florida Produced Unreliable Results and Should Not Have Been Certified

26.     In the Help America Vote Act ("HAVA") 52 US.C.A. § 21083, **Congress has mandated as follows: HAVA - voting system error rate "…(5) Error RATES.—The error rate of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission ("FEC") which are in effect on the date of the enactment of this Act."**

27.     Congress enacted, and President Bush signed HAVA into law, in 2002 and it

---

[2] Petitioners do not request this Court order Respondents to exercise their *discretion* or make any decision at all apart from enforcing the specific, non-discretionary, requirements of the law outlined *inter alia* below.

remains the law of the United States to date.

28.    The voting standards of the FEC in effect at the time Congress enacted HAVA in 2002 were the Voting Systems Standards Volume I: Performance Standards (2002).[3]

**29.    Those voting standards in effect at the time HAVA became law allowed for *one error* per 500,000 ballot *positions*.**

30.    Petitioners believe and therefore aver that a federal election that exceeded an error rate of one error per 500,000 ballot *positions* renders a federal election unreliable.

31.    As the HAVA provision enacted in 2002 cited above has not changed, the error rate of one error per 500,000 ballot *positions* is currently the law of the United States.

32.    A "ballot *position*" refers to the number of individual "choices" a voter could make on a single ballot.  For example, if a particular ballot has thirty little circles for the voter to fill-in or not fill-in, that single ballot would be said to contain thirty ballot positions.

33.    A voting system error occurs anytime the voting scanning machine should have discerned an error, not made by the voter, while counting one of those ballot positions on a scanned ballot.

34.    Experts working for the FEC estimated that 500,000 ballot *positions* equaled 125,000 *individual ballots*. (See Election Assistance Commission Voluntary Voting System Guidelines of 2015, *U.S. Election Assistance Commission*. United States [Web Archive] Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf

---

[3] As of 2021, there have been five iterations of the national level voting system standards. The Federal Election Commission published the first two sets of federal standards in 1990 and 2002 (VSS1990 and VSS2002). The Election Assistance Commission then adopted Version 1.0 of the Voluntary Voting System Guidelines (VVSG 1.0, or VVSG2005) on December 13, 2005. On March 31, 2015, the EAC commissioners approved VVSG 1.1 (VVSG2015). On February 10, 2021, the EAC approved VVSG 2.0 (VVSG2021).

35.     Petitioners believe and therefore aver that the EAC desired to clarify the meaning of 500,000 ballot *positions* in terms of how many individual ballots "make-up" 500,000 ballot *positions* in order to make easier understanding the election "error rates" permissible by HAVA.

36.     Petitioners believe and therefore aver (and will present expert testimony to so substantiate) that the calculation made by the FEC that 500,000 ballot positions represents 125,000 individual ballots is correct and represents the proper interpretation of federal law and Congressional intent under HAVA.

37.     In the 2022 Florida General Election, 7,796,916 individual ballots were recorded by election officials as cast.

38.     For the 2022 General Election if 7,796,916 (ballots cast) is divided by 125,000 (because the law allows for one error per 125,000 ballots), that leaves sixty-three (63) (rounded up) as the maximum number of errors permitted under federal law for that election.  Only upon a showing of 63 of fewer errors, then, would HAVA permit Florida election officials to certify the 2022 election as valid.

39.     If there were more than sixty-three (63) voting system errors in the entire ballot tabulation for all ballots cast in the 2022 election in Florida, the election results are unreliable.

40.     Florida exceeded this benchmark of sixty-three (63) voting system errors in the 2022 General Election as outlined below.

41.     Petitioners believe and therefore aver that contributing to the unreliability of Florida's 2022 election is the fact that Florida's voter registration rolls, themselves, contained *hundreds of thousands* of potential errors at the time of the 2022 General Election.

42.     These potential errors were in the form of illegal duplicate registrations, voters with invalid or illogical voter history, voters placed in inactive statuses on questionable

authority, backdated registrations, registrations with a modified date prior to registration, invalid or illogical registration dates, age discrepant registrants, and registrants with questionable addresses.

43.     While Congress may not have specifically intended for these types of errors to be included in the one out of 500,000-error rate, Petitioners believe and therefore aver that this figure provides a general benchmark for what the Legislature considered an acceptable degree of error in our elections.

44.     Such errors jeopardize the validity of elections throughout Florida, bring doubt as to the accuracy and integrity of the Florida's currently-in-place voting systems, undermine Floridians' collective voting rights, all in violation of existing state and federal election laws.

45.     Petitioners seek redress from these voter registration apparent errors, relief from blatantly inaccurate voter registration rolls, relief from discrepancies between votes cast and actual votes reported, and relief from extreme voting errors generally, which collectively and historically amount to violations of federal election laws, Florida election laws, and various voting rights encompassed by the United States Constitution.

46.     The aforesaid violations of federal and state law have in the past resulted in the certification of election results from provably flawed, inaccurate, and obscure processes outside the view of impartial witnesses or the public, and Respondents have refused collectively to maintain or enforce compliance with federal and state required transparency mandates.

47.     Petitioners have brought this issue to the attention of Respondents, who have done absolutely nothing to address these errors ensuring future elections will suffer from the same deficiencies.

48.     Furthermore, rather than be alarmed by these apparent errors pursuant to

prevailing election laws, Respondents instead have collectively ignored the issue of the unreliable election results therefore produced.

49.     Petitioners believe and therefore aver Respondents have failed to adequately police and monitor problems with the voter rolls and failed to adequately fix voting registration errors within the State of Florida, despite being in the best position to ensure the reliability, integrity, and accuracy of Florida's elections to ensure veracity of the state's election results.

50.     Petitioners have repeatedly made good faith and sincere efforts to negotiate and get Respondents to respond to their legitimate concerns.

51.     Petitioners have repeatedly shown Respondents evidence of potential violations of election law, regarding the conduct of elections by local and state officials charged with administering elections, on behalf of all citizens in accordance with the law.

52.     The risk of election subversion is indisputable, but the State of Florida has denied Petitioners denied a fair hearing, despite the serious nature of Petitioners' findings calling into question the reliability, integrity and accuracy of prior federal elections administered by the State of Florida.

53.     The prayer for relief seeks the protection of Petitioners' rights, as well as those of every voting citizen of Florida, to have their vote fairly counted in an open and reliable election as such elections are defined according to law as outlined below.

54.     Respondents have denied Petitioners' their right to a fair vote.

55.     Furthermore, Respondents appear to have followed procedures that have obscured the ability to audit the 2022 general election to render the outcomes factually unknowable, at the time of certification.

56.     Petitioners believe and therefore aver Respondents have violated multiple federal

and state laws, or negligently allowed such violations to occur, while loudly proclaiming the infallibility of the State of Florida's election results.

57.     Respondents insist that Petitioners have adequate voting rights, while simultaneously fighting from every conceivable angle to prevent Petitioners from attempting to protect those rights. Respondents' collective actions in refusing to address the problem extinguishes and undermines the very meaning of the right to vote in a fair democracy.

58.     Respondents can and should be compelled to address compliance with existing election law, specifically: compelled to adequately investigate the issue, prosecute anyone in violation of federal and/or state law, and actively work to bring the State of Florida back into compliance with federal and state election law mandates so that Florida's constitutionally enshrined voting rights are upheld and preserved.

59.     The All-Writs Act, 28 U.S.C. § 1651 provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law."

60.     District Courts of the United States have original jurisdiction of any action in the nature of *mandamus* to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff. 28 U.S.C. § 1361.

**Parties**

61.     United Sovereign Americans, Inc., is a nonprofit corporation incorporated in the state of Missouri.

62.     Jeffrey Buongiorno is an individual who is running for Supervisor of Elections for Palm Beach County, FL, and who resides at 3851 North Ocean Blvd. #406, Gulfstream, FL 33483.

63.     Cathi Chamberlain is an individual who is a poll watcher for Pinellas County, FL, with the address of 10520 San Fernando Blvd. NE, Saint Petersburg, FL 33702.

64.     Gabrielle Fox is an individual running for the Florida House of Representatives for District 94, with the address of 3330 Fairchild Gardens Ave., #33663 Palm Beach Gardens, FL 33410.

65.     Christopher Gleason is an individual running for Supervisor of Elections for Pinellas County, FL, with an address of 1628 Sand Key Estates Court, Clearwater, FL 33767.

66.     Gerry James is an individual running for the Florida Senate for District 7 with the address of 4811 Otter Creek Lane, Ponte Vedra Beach, FL 32082.

67.     Judith Jensen is an individual running for Supervisor of Elections for Alachua County, FL, with an address of 22714 NW 191st Lane, High Springs, FL 32643.

68.     Jane Justice is an individual running for the Florida House of Representatives for district 87 with the address of 3661 Via Ponciana, #314, Lake Worth, FL 33467.

69.     Mara Macie is an individual running for United states Congress for Florida's 5th district with an address of 336 W 6th Street, Jacksonville, FL 32206.

70.     Michael Peters is an individual running for Supervisor of Elections for Lee County, FL, with an address of 241 Alameda Ave., Fort Myers, FL 33905.

71.     David Schaffel is an individual running for Supervisor of Elections for Collier County, FL, with an address of 4344 Montalvo Ct., Naples, FL 34109.

72.     Darlene Cerezo Swaffar is an individual running for United States Congress for Florida's 23rd district with an address of 10 Fairway Drive, Suite 118, Deerfield Beach, FL 33441. Darlene Swaffar was also a candidate in 2020 and 2022.

73.     Cord Byrd, in his Official Capacity as the Secretary of Florida, was appointed by

the governor to oversee the Department of State. He and his department are tasked with administering and ensuring Florida's compliance with Florida's Election Code, Florida's compliance with federal law – namely the Help America Vote Act, and the National Voter Registration Act.

74.     The Florida Division of Elections is a governmental entity responsible for administering and ensuring the state's compliance with Florida's Election Code and the State's compliance with federal law including the Help America Vote Act, and the National Voter Registration Act.

75.     Ashley Moody, in her Official Capacity as the Attorney General of Florida, is responsible for overseeing and managing the Office of the Attorney General of Florida which is a government agency tasked with the enforcement and prosecution of state law in addition to ensuring that state actors, including those acting within the Florida Department of State, are complying with Florida law.

76.     Merrick Garland, in his Official Capacity as the Attorney General of the United States, is the chief law enforcement official in the United States, and is responsible for overseeing and managing the Department of Justice of the United States which is a government agency tasked with the enforcement and prosecution of federal law in addition to ensuring that state and federal actors, including those acting in the various states within the United States, are complying with Federal law.

**Jurisdiction and Venue**

77.     This Court has jurisdiction pursuant to 28 U.S.C. § 1651.

78.     This Court has jurisdiction pursuant to 28 U.S.C. § 1361.

79.     This Court additionally has subject matter jurisdiction over this complaint

because the case presents substantial questions of federal law, and the state claims are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. §§ 1331 and 1367.

80.   This Court has personal jurisdiction as the Respondents are a collection of State agencies and actors, and the State of Florida is within the jurisdiction of the United States.

81.   "When a state exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Gray v. Sanders*, 372 U.S. 368, 372 (1963) (citing *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960)).

82.   Venue is proper in this district under 28 U.S.C. § 1391(e)(1).

## Standing

83.   Jeffrey Buongiorno is a citizen of Palm Beach County, Florida, and a candidate for Supervisor of Elections for Palm Beach County in 2024. Upon review of the allegations of the within petition, Mr. Buongiorno has a reasonable belief that Respondents' failure to address and enforce state and federal election law in 2022 upon notice of voting and registration irregularities occurring during that federal election in Florida will adversely affect the integrity of the 2024 County Supervisor of Elections election.  As such, Mr. Buongiorno has brought this petition for Writ of Mandamus seeking the Court to compel Respondents to perform their duties as state and federal election law requires.

84.   Cathi Chamberlain is a citizen of Florida, Pinellas County, is a poll watcher for Pinellas County, and voted in the 2020 and 2022 elections. Upon review of the allegations of the within petition, Ms. Chamberlain has a reasonable belief that Respondents' failure to address and enforce state and federal election law in 2022 upon notice of voting and registration

irregularities occurring during that federal election in Florida will adversely affect the integrity of the 2024 Florida federal and state elections.  As such, Ms. Chamberlain has brought this petition for Writ of Mandamus seeking the Court to compel Respondents to perform their duties as state and federal election law requires.

85.    Petitioner Gabrielle Fox is a citizen of Florida, Palm Beach County, and is a candidate for Florida State Representative in the 2024 election season.

86.    Petitioner Christpher Gleason is a citizen of Florida, Pinellas County, and is a candidate for Pinellas County Supervisor of Elections in the 2024 election season.

87.    Gerry James is a citizen of Florida, St. Johns County, and is a candidate for Florida Senate for district 7 in the 2024 election season.

88.    Petitioner Judith Jensen is a citizen of Florida, Alachua County, and is a candidate for Alachua County Supervisor of Elections in the 2024 election season.

89.    Petitioner Jane Justice is a citizen of Florida, Palm Beach County, and is a candidate for Florida House of Representatives for district 87 in the 2024 election season.

90.    Petitioner Mara Macie is a citizen of Florida, Duval County, and is a candidate for US Congress for Florida's 5th district in the 2024 election season.

91.    Petitioner Michael Peters is a citizen of Florida, Lee County, and is a candidate for Lee County Supervisor of Elections.

92.    Petitioner David Schaffel is a citizen of Florida, Collier County, and is a candidate for Collier County Supervisor of Elections.

93.    Petitioner Darlene Cerezo Swaffar is a citizen of Florida, Broward County, and is a candidate for US Congress for Florida's 23rd district in the 2024 election season. Petitioner Darlene Swaffar was also a candidate in 2020 and 2022.

94.   Petitioner United Sovereign Americans uncovered overwhelming evidence of registration issues in the 2022 election. In particular, it discovered that for the 2022 elections:

    a.   270,804 registrations had invalid addresses;

    b.   11,819 registrations were from a single family home with 10-15 people registered to it;

    c.   10,988 registrations were from a single apartment or lot with 6-89 people registered to it;

    d.   17,096 registrations were illegal duplicates;

    e.   157,960 registrations were inactive with 8 or more years without voting;

    f.   41,336 registrations were registered while voter rolls were closed for the 2022 General Election;

    g.   439 registrations were backdated;

    h.   887 registrations were for individuals older than 110 (the age of Florida's oldest known person);

    i.   507 individuals were registered to vote before the age of 16;

    j.   19,771 individuals were registered to vote on a Sunday;

    k.   20,213 individuals were registered to vote on a federal holiday;

    l.   12,912 voter registrations contained an invalid name;

    m.   77,063 voters had an invalid or incomplete address on their voter registrations;

    n.   3,042 voters had 10-15 voters registered at a single family home;

    o.   2,470 voters had 6-89 voters registered in a single apartment or lot;

    p.   6,867 voters had illegal duplicate registrations;

    q.   1,724 voters with double or more votes had illegal duplicate registrations;

    r.   51 voters registered after the 2022 General Election cutoff date – but still voted;

s.      208 voters had backdated registrations;

t.      3 voters were registered as being older than 110 (the age of Florida's oldest known person);

u.      10,132 voters were registered on a Sunday;

v.      12,207 voters were registered on a federal holiday;

w.      7,844 voters had registrations with invalid names;

x.      88,635 voters reported blank ballots;

y.      42 voters voted twice.

*See* Exhibit "B" for the Florida 2022 General Election Validity Scorecard.

95.    There is active litigation concerning Florida's compliance with the Help America Vote Act ("HAVA"), in that certain state directives violate United States federal election law.

96.    Petitioners have been and are currently harmed by the State of Florida voting systems currently and formerly in use in Florida state and federal elections. Respondents have allowed, and continue to allow, violations of federal laws, Florida elections laws, the United States Constitution, and federal civil rights laws pertaining to voter rights.

97.    The violations of Florida State election laws, federal election laws, the U.S. Constitution, and federal civil rights laws pertaining to voter registration rolls, transparency, compliance, and certification of the voting systems, and the serious issues hereinafter discussed with the overall voting systems exemplify their injury.

98.    The injury to Petitioners and all Florida voters would cease to exist or be greatly relieved if the Court grants Petitioners' requested relief.

99.    The Supreme Court has indicated that if one party to a lawsuit has standing, other entities can join as parties without having to independently satisfy the demands of Article III,

provided those parties do not seek a distinct form of relief from the party with standing. *See, Horne v. Flores*, 557 U.S. 433, 446-47 (2009).

100.    United Sovereign Americans is not seeking a distinct form of relief from the other Petitioners and therefore has standing.

101.    Citizens Defending Freedom is not seeking a distinct form of relief from the other Petitioners and therefore has standing.

**Background**

**A.  THE CONSTITUTIONALLY PROTECTED RIGHT TO VOTE**

102.    The United States Constitution grants the people the right to choose representatives to the people of several states, according to the voting eligibility requirements of the state. U.S. Const. art. 1, § 2.

103.    The 14th Amendment of the United States Constitution, Section 1, defines a "citizen" as all people born or naturalized in the United States and subject to the jurisdiction thereof.

104.    The 14th Amendment of the United States Constitution, Section 2, protects eligible citizen voters against denial or abridgment of their vote.

105.    "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 1 Cranch 137, 5 U.S., 137, 163 (1803).

106.    Federal courts regard the right to vote in a fairly conducted election as a constitutionally protected feature of United States citizenship. *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964).

107.    After the 2020 Presidential Election, pervasive discussion reported on by the

media focused on the validity of the presidential election results within the State of Florida.

108.   Discussions and/or litigation in Florida, as well as in other states around the Nation, centered on whether raw vote totals were accurate, with particular attention focused on the question: if all ballots in dispute were decided, hypothetically, in the favor of one candidate for president over the other, would that have changed the *outcome* of the election in that state?

109.   Questions concerned whether the recorded vote totals, viewed in the light most favorable to the losing candidate in any given state, could have affected the awarding of electoral votes from said state, which, in turn, might have affected the determination of the "winner" of the elections for president and vice-president in the Electoral College.

110.   The media widely reported that no court ruled that, even if all disputed ballots were assumed to have been found to be favorable to the Republican Candidate during the 2020 presidential election, the outcome in any disputed state would not have been affected. Furthermore, there was insufficient evidence produced such that a court could find that the outcome of the election in any disputed state was unreliable.

111.   Petitioners do not seek to revisit the results of the 2020 presidential election, nor to re-examine the conclusions drawn by the various courts and media outlets as summarized above.

112.   Petitioners posit a different question than that noted above: ***How many disputed ballots found to be improperly cast in any given federal election may occur before the reliability and integrity of the entire election becomes suspect?*** Petitioners respectfully represent that Congress has answered this very question as outlined further below and Congress' answer to this question forms much of the basis of the instant Petition.

113.   In *In re: Coy*, 127 U.S. 731 (1888), the United States Supreme Court held that

Congress had authority under the Constitution's Necessary and Proper Clause to regulate any activity during a mixed federal/state election that exposed the federal election to potential harm, whether that harm materialized or not. *Coy* is still good law. *See*, *United States v. Slone*, 411 F.3d 643, 647 (6th Cir. 2005); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 874–75 (5th Cir. 1982); *Ex parte Yarborough*, 110 U.S. 651 (1884); *Ex parte Siebold*, 100 U.S. 371 (1880).

114.    In *Oregon v. Mitchell,*  the Supreme Court stated:

> The right to vote is, of course, different in one respect from the other rights in the economic, social, or political field which, as indicated in the Appendix to this opinion, are under the Equal Protection Clause. The right to vote is a civil right deeply embedded in the Constitution. Article I, § 2, provides that the House is composed of members 'chosen . . . by the People' and the electors 'shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.' The Seventeenth Amendment states that Senators shall be 'elected by the people.' The Fifteenth Amendment speaks of the 'right of citizens of the United States to vote' -- not only in federal but in state elections.

> * * *

> [T]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. This 'right to choose, secured by the Constitution,' *United States v. Classic*, 313 U.S. 299, is a civil right of the highest order. Voting concerns 'political' matters; but the right is not 'political' in the

constitutional sense. Interference with it has given rise to a long and consistent line

of decisions by the Court; and the claim has always been upheld as justiciable.

*Mitchell*, 400 U.S. 112, at 138-39 (1970).

115.    Justice Harlan also stated the following in his concurring opinion:

[A]s the right in the people of each State to a republican government and to

choose their Representatives in Congress is of the guarantees of the Constitution,

by this amendment a remedy might be given directly for a case supposed by

*Madison*, where treason might change a State government from a republican to a

despotic government, and thereby deny suffrage to the people.

*Mitchell*, 400 U.S. at 185 (Harlan, J., concurring in part).

116.    The Supreme Court further stated: "we are cautioned about the dangers of

entering into political thickets and mathematical quagmires. Our answer is this: a denial of

constitutionally protected rights demands judicial protection; our oath and our office require no

less of us." *Reynolds v Sims*, 377 U.S. 533, 566 (1964).

117.    "Every voter in a federal . . . election . . . whether he votes for a candidate with

little chance of winning or for one with little chance of losing, has a right under the Constitution

to have his vote fairly counted, *without its being distorted by fraudulently cast votes*." *Anderson*

*v. United States,* 417 U.S. 211, 227 (1974) (emphasis added).

## B.  NATIONAL VOTER REGISTRATION ACT ("NVRA")

118.    The National Voter Registration Act ("NVRA") was passed for the purpose of

ensuring accurate and current voter registration rolls to enhance the integrity of elections.

119.    In so doing, Congress found that: (1) the right of citizens of the United States to

vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities. 52 US.C.A. § 20501.

120.    The NVRA exists in part to "protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." 52 US.C.A. § 20501.

121.    The NVRA *requires* states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change of address. 52 U.S.C. § 20507(a)(4).

122.    Similarly, the U.S. Election Assistance Commission ("EAC") is required by law to report to Congress its findings related to state voter registration practices. 52 U.S.C. § 20508(a)(3).

123.    Federal regulations require states to provide data to the EAC for use in their reports, including the numbers of active voters, and the numbers of registered voters removed from the rolls for any reason. 11 C.F.R. § 9428.7(b)(1), (2), (5).

124.    The NVRA requires the States to complete any program the purpose of which is to remove ineligible voters from the official lists of eligible voters not later than ninety (90) days prior to an election.

125.    NVRA has two (2) methods of enforcement. First, the Attorney General can petition the court for declaratory and injunctive relief. Second, a private citizen can pursue a cause of action with certain requirements as follows. In a private action, notice is required, in that a person must notify the chief election official of the State involved. If the violation is not

corrected within 90 days of receipt of the notice or within 20 days after receipt of the notice, if the violation occurred within 120 days before the date of an election for office, the aggrieved person may bring a civil action in an appropriate district court seeking relief. In the alternative, if the violation occurs 30 days before the date of an election for federal office, no notice is required.

126.    Although the NVRA authorizes a private cause of action in the form of declaratory or injunctive relief, this "remedy" is largely toothless. Any Court in the United States would have great reluctance to formally order election officials to correct the NVRA error and/or decertify an election so close in time to an actual election or just after certification.

127.    Additionally, to what extent the NVRA requires a hypothetical plaintiff to have suffered injury is not clear – standing could be a troublesome burden to prove particularly if the harm, such as voter fraud and dilution, has been committed on a class people, the electors as a whole, rather than on an individual person.

128.    Furthermore, a Court could attempt to use the doctrine of laches to avoid the distasteful task of questioning election officials, inquiring into potentially fraudulent elections, and inaccurate voting rolls, despite a hypothetical plaintiff being in full compliance with the private NVRA notice requirements.

129.    Congress's power to pass the NVRA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voter rolls a requirement to uphold the right of the people to choose their representatives.

## C.  HELP AMERICA VOTE ACT ("HAVA")

130.    The Help America Vote Act ("HAVA") exists in part to "establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and other purposes." H.R. 3295 (2002).

131.     HAVA requires that voter roll databases contain only the registrations of qualified citizen voters residing in that state. 52 US.C.A. § 21083(a).

132.     HAVA defines a voting system as "the total combination of mechanical, electromechanical, or electronic equipment (including software, firmware, and documentation required to program, control, and support the equipment) that is used to define ballots; to cast and count votes; to report or display election results; and to maintain and produce any audit trail information." 52 US.C.A. § 21081(b).

133.     The purpose of any voting system is to accurately record, store, consolidate, and report the specific selections, and absence of selections, made by the voter as well as to accurately measure the intent of the total body of eligible voters that voted.

134.     Petitioners believe and therefore aver the ability to "cast and count votes" begins with establishing eligibility and registering only qualified citizens into voter registration databases, thus assuring that all ballots granted, cast, and counted, are lawful.

135.     Petitioners believe and therefore aver that inaccurate voter rolls have significant negative consequences in elections.

136.     Per HAVA, in any given state, each qualified voter is granted a unique statewide identifier in a database, which averts the risk of double-voting or extra ballots being cast in the name of one individual voter.

137.     HAVA furthermore requires that federal elections adhere to an accuracy standard established by the FEC through Section 3.2.1 of its Voting System Standards (2002), which states in relevant part that error rates are "…*set at a sufficiently stringent level such that the likelihood of voting system errors affecting the outcome of an election is exceptionally remote even in the closest of elections.*" United States (2002) *U.S. Federal Election Commission FEC.*

United States [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf (emphasis added).

138.   Accuracy in a voting system is defined as the ability of the system to capture the intent of voters without error. United States. (2002) *U.S. Federal Election Commission FEC*. United States [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf.

139.   Section 301 of HAVA regarding "Voting System Standards," states that the "error rate of [a] voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission." 52 US.C.A. § 21081(a)(5).

140.   Petitioners ask this Court to recall that, the FEC voting systems standards of section 3.2.1 establish that "the system shall achieve a target error rate of no more than **one in 10,000,000 ballot positions, with a maximum acceptable error rate in the test process of one in 500,000 ballot positions.**" *See*, *supra*. at 30 (emphasis added).

141.   The Voluntary Voting System Guidelines ("VVSG"), Version 1.1, Section 4.1.1 – Accuracy Requirements state, in part, **"[a]ll systems shall achieve a report total error rate of no more than one in 125,000."** Furthermore, "[t]he benchmark of one in 125,000 is derived from the 'maximum acceptable error rate' used as the lower test benchmark in the 2005 Voluntary Voting System Guidelines Version 1.0. That benchmark was defined as a ballot position error rate of one in 500,000. The benchmark of one in 125,000 is expressed in terms of votes, however, it is consistent with the previous benchmark that the estimated ratio of votes to

ballot positions is ¼." United States (2015) *U.S. Election Assistance Commission.* United States [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf.[4]

142.    HAVA also requires that states who receive payments for the administration of elections must use the funds "in a manner consistent with each of the laws described in Section 21145 . . . and the proposed uses are not inconsistent with the requirements of Title III." 52 U.S.C. § 20971(c).

143.    A private cause of action may exist for HAVA through 42 U.S.C. § 1983. *Colon-Marreror v. Velez*, 813 F.3d 1, 22 (1ˢᵗ Cir. 2016) (finding a private action under §1983 for HAVA violations because the provision provided enforceable voting rights and imposes binding obligations on state officials).

144.    Section 1983 provides a mechanism for enforcing individual rights secured elsewhere as in rights independently secured by the Constitution and laws of the United States. *Gonzaga University v. Doe*, 536 U.S. 273, 284-85 (2002). Importantly, a §1983 plaintiff must assert a violation of a federal right, not just a law. *Blessing v. Freestone,* 520 U.S. 329, 340 (1997).

145.    A private cause of action pursuant to §1983 can be found for violations of HAVA, which requires voting systems to provide the voter with the opportunity to change the ballot or correct any apparent error before the ballot is cast and counted. 52 USC 21081(a)(1)(A)(ii). The violation could be produced by a configuration of the voting machines.

146.    Section 1983 is currently the only mechanism where HAVA violations will

---

[4] In the latest version of the VVSG, or VVSG 2.0, the EAC adopted the position that "the value of 10,000,000 ballot positions is taken from VVSG 1.0 [VVSG2005], however it is used here as the minimum number of ballot positions to test without error. *If a larger number of ballot positions is used, there still can be no error*." (emphasis added).

receive any meaningful private review, yet it has proven thus far to be ineffectual at providing any real remedy for HAVA violations.

147.    Congress's power to pass the HAVA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voting systems a requirement to uphold the right of the people to choose their representatives.

## FLORIDA ELECTION LAWS

148.    Florida statutes provide for establishment of the State Division of Elections, which is an administrative body designed to assist the Secretary of State with the administration of federal and state elections. Fla. Stat. § 20.10.

149.    As such, the Florida Secretary of State is the Chief Elections Officer of Florida. Fla. Stat. § 97.012.

150.    *Per* Florida Statutes § 97.012, the State Board of Elections, among other things, is required to do the following:

a.      Obtain and maintain uniformity in the interpretation and implementation of the election laws.

b.      Provide uniform standards for the proper and equitable implementation of the registration laws by administrative rule of the Department of State;

c.      Actively seek out and collect the data and statistics necessary to knowledgeably scrutinize the effectiveness of election laws;

d.      Provide technical assistance to the supervisors of elections on voting systems;

  e. **Coordinate the state's responsibilities under the NVRA**;

  f. Provide training to all effected state agencies on the necessary procedures for proper implementation of this chapter;

  g. Ensure that all registration applications and forms prescribed or approved by the department are in compliance with Voting Rights Act of 1965 and the NVRA;

  h. Create and administer a statewide voter registration system as required by the HAVA;

  i. Maintain a voter fraud hotline and provide election fraud education to the public;

  j. Bring and maintain such actions at law or in equity by mandamus or injunction to enforce the performance of any duties of a county supervisor of elections or any official performing duties with respect to chapters 97 through 102 and 105 or to enforce compliance with a rule of the Department of State adopted to interpret or implement any of those chapters;

  k. Conduct preliminary investigations into any irregularities or fraud involving voter registration, voting, candidate petition, or issue petition activities and report his or her findings to the statewide prosecutor or state attorney for the judicial circuit in which the alleged violation occurred for prosecution, if warranted.

151. Florida statutes require a person to be 18 years old, a citizen of the United States, a legal resident of the state of Florida, a legal resident of the county in which that person seeks to be registered; and registered pursuant to the Florida Election Code, to qualify for voter registration. Fla. Stat. § 97.041.

152. The Florida Election Code also dictates that voters offering to vote in person shall present photographic identification before voting. The clerk or inspector shall require each

elector, upon entering the polling place, to present photo identification. Fla. St. § 101.043.

153.    Florida election laws describe numerous, criminal acts that constitute Misdemeanors and Felonies for failing to adhere to basic election guidelines:

      a.     False Declaration to Secure Assistance in Preparing A Ballot (Fla. Stat. § 104.041);

      b.     Fraud In Connection With Casting a Vote (Fla. Stat. § 104.041)

      c.     Vote-By-Mail Ballots and Voting; Violations (Fla. Stat. § 104.047);

      d.     Violations; Neglect of Duty; Corrupt Practices (Fla. Stat. § 105.051);

      e.     Voting Rights; Deprivation Of, Or Interference with, Prohibited (Fla. Stat. § 105.0515);

      f.     Voting With a Fraudulent Ballot (Fla. Stat. § 105.16);

      g.     Voting In Person After Casting Vote-By-Mail Ballot (Fla. Stat. § 104.17);

      h.     Casting More Than One Ballot (Fla. Stat. § 104.18)

154.    Petitioners believe and therefore aver that the state cannot demonstrate effective control over voter eligibility in conformity with federal or state requirements, and the state has implemented a system that does not guarantee accuracy or compliance with legal mandates requiring the State to ensure that only eligible voters may register and vote.

## D.  ELECTION FRAUD CONGRESS SOUGHT TO GUARD AGAINST

155.    Petitioners do not accuse any person or entity of engaging in election fraud in 2022, nor propose any person or entity will engage in such fraud in 2024 or in subsequent federal elections in Florida.  Petitioners' purpose in describing types of voter fraud is to set forth the harms Congress sought to avoid by implementation of HAVA and NVRA as well as the various statutes passed by the Florida General Assembly and cited above.

156.     Petitioners believe and therefore aver election fraud can occur in multiple diverse ways, not all of which are individualized to a specific actor.

157.     Petitioners believe and therefore aver over the past fifty years, Congress has enacted criminal laws with broad jurisdictional basis to combat false voter registrations, vote-buying, multiple-voting, and fraudulent voting in elections in which a federal candidate is on the ballot. *See,* 52 U.S.C. §§ 10307(c), 10307(e), 20511.

158.     The federal jurisdictional predicate underlying these statutes is satisfied as long as either the name of a federal candidate is on the ballot, or the fraud involves corruption of the voter registration process in a state where one registers to vote simultaneously for federal as well as other offices. *Slone*, 411 F.3d at 647–48; *United States v. McCranie*, 169 F.3d 723, 727 (11th Cir. 1999).

159.     Voting in federal elections for individuals who do not personally participate in, and assent to, the voting act attributed to them, or impersonating voters, or casting ballots in the names of voters who do not vote in federal elections, can constitute prosecutable election fraud. *See,* 52 U.S.C. §§ 10307(c); 10307(e); 20511(2).

160.     It is *possible* for election officials acting "under color of law" to commit election fraud by performing acts such as diluting ballots with invalid ones (ballot stuffing), rendering false tabulations of votes, or preventing valid voter registrations or votes from being given effect in any election, federal or non-federal (18 U.S.C. §§ 241, 242), as well as in elections in which federal candidates are on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), 20511(2).[5]

---

[5] For purposes of the present Petition, Petitioners do not suggest any Florida election officials engaged in election fraud. Rather, Petitioners' point out the *possibility* of improper conduct by election officials as a harm against which Congress and the General Assembly have sought to guard by enacting the various statutes cited here. A reason Congress, especially in HAVA, set forth standards that must be met before an election is considered reliable is to counter potential election fraud and to thus produce presumptively reliable election results.

161.    An individual commits election fraud by submitting fictitious names to election officers for inclusion on voter registration rolls, thereby qualifying the fictitious name to vote in federal elections. 52 U.S.C. §§ 10307(c), 20511(2).

162.    An individual commits election fraud by knowingly procuring eligibility to vote for federal office by people who are not entitled to vote under applicable state law and/or people who are not United States Citizens. 52 U.S.C. §§ 10307(c), 20511(2); 18 U.S.C. §§ 1015(f).

163.    An individual who makes a false claim of United States Citizenship to register to vote commits election fraud. 18 U.S.C. § 1015(f); 18 U.S.C. § 911.

164.    A person who provides false information concerning a person's name, address, or period of residence in a voting district to establish voting eligibility commits election fraud. 52 U.S.C. §§ 10307(c), 20511(2).

165.    Fraud can occur where an individual causes the production of voter registrations that qualify alleged voters to vote for federal candidates, where that individual knows the registrations are materially defective under applicable state law. 52 U.S.C. § 20511(2)

166.    However, election fraud need not involve the participation of individual voters.

167.    Election fraud can occur where an individual or organization places fictious names on voter rolls (allowing for fraudulent ballots which can later be used to stuff the ballot box, *supra*.), casting fake ballots in the names of people who did not vote, obtaining and marking absentee ballots without the input of the voter involved, and falsifying vote tallies.

168.    When the federal government seeks to maintain the integrity of elections, it does so for specific federal interests *inter alia*: (1) the protection of the voting rights of racial, ethnic, or language minorities, a specific constitutional right; (2) the registration of voters to vote in federal elections; (3) the standardization and procurement of voting equipment purchased with

federal funds; (4) the protection of the federal election process against corruption; (5) the protection of the voting process from corruption accomplished under color of law; and (6) the oversight of non-citizen and other voting by persons ineligible to vote under applicable state law. Richard C. Pilger, *Federal Prosecution of Election Offenses*, p. 30, 8th Edition (2017).

169.    Congress has enacted a litany of specific crimes that can be prosecuted under a general definition as "election fraud":

   a.   Conspiracy Against Rights: 18 U.S.C. § 241. *See United States v. Saylor*, 322 U.S. 385 (1944) (stuffing a ballot box with forged ballots); *United States v. Classic*, 313 U.S. 299 (1941) (preventing the official count of ballots in primary elections); *United States v. Townsley*, 843 F.2d 1070, 1073–75 (8th Cir. 1988) (destroying ballots); *United States v. Morado*, 454 F.2d 167, 171 (5th Cir. 1972) (casting absentee ballots in elderly or handicapped peoples' names); *Crolich v. United States*, 196 F.2d 879, 879 (5th Cir. 1952) (impersonating qualified voters); *United States v. Colvin*, 353 F.3d 569, 576 (7th Cir. 2003) (conspiracy need not be successful nor need there be an overt act).

   b.   Deprivation of Rights under Color of Law: 18 U.S.C. § 242. *See United States v. Price*, 383 U.S. 787 (1966) (acted jointly with state agents); *Williams v. United States*, 341 U.S. 97 (1951) (actions clothed under Color of State Law).

   c.   False Information in, and Payments for, Registering and Voting: 52 U.S.C. § 10307(c).[6]

---

[6] "Section 10307(c) protects two distinct aspects of a federal election: the actual results of the election, and the integrity of the process of electing federal officials." *United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 1994).

d.   Voting More than Once: 52 U.S.C. § 10307(e).

e.   Fraudulent Registration or Voting: 52 U.S.C. § 20511(2).

f.   False claims to Register or Vote: 18 U.S.C. § 1015(f).

g.   "Cost-of-Election" theory: 18 U.S.C. § 1341.

h.   Improper Retention of Federal Election Returns: 52 U.S.C. § 20701.

170.    In short, election fraud can constitute numerous different actions or inactions, and federal and state governments of the United States have an interest in guarding the integrity of elections, and ensuring election fraud is stopped, then prosecuted appropriately.

## Facts and Summary of the Issues

171.    Petitioner United Sovereign Americans received Florida's voter registration data from the 2022 general election – the data contained millions of entries of voter registration data.

172.    Thereafter, expert data analysts acting on behalf of Petitioner United Sovereign Americans performed a series of SQL database queries on the data to extrapolate and refine information about voter registrations in Florida. *See* Exhibit "A" for a copy of the SQL Database Queries.

173.    Thereafter, Petitioner United Sovereign Americans thoroughly reviewed the results.

174.    United Sovereign Americans' SQL database queries revealed hundreds of thousands of voter registration apparent errors in the State of Florida. See *Infra.*

175.    The results from the SQL database queries allowed Petitioners' experts to produce a "Scorecard" reflecting Florida's voter registration data detailing the hundreds of thousands of apparent errors contained within that registration data. *See* Exhibit "B" for a copy

of United Sovereign American's Florida 2022 General Election Validity Scorecard.

176.    In addition, the results from the SQL Database Queries of Florida's voter registration data allowed Petitioners' experts to compile a General Election Validity Reconciliation. *See* Exhibit "C" for a copy of United Sovereign American's Florida 2022 General Election Validity Reconciliation.

177.    The results from the SQL Database Queries of Florida's voter registration data also revealed that apparent errors were not uniform across Florida – some counties had far more registration apparent errors than others. *See* Exhibit "D" for a copy of United Sovereign American's Florida 2022 General Election county-by-county breakdown.

178.    According to the data provided to Petitioner United Sovereign America for the 2022 election, Florida had 15,742,645 voter registrations.

## A.    VOTER REGISTRATION ROLL INACCURACY

179.    Expert analysis by Petitioner United Sovereign Americans of the official Florida State Voter Registration Data for the 2022 election revealed that, out of 15,742,645 voter registrations, there was a total of **564,732** voter registration violations including:

270,804 registrations had invalid addresses;

11,819 registrations were from a single family home with 10-15 people registered to it;

10,988 registrations were from a single apartment or lot with 6-89 people registered to it;

17,096 registrations were illegal duplicates;

157,960 registrations were inactive with 8 or more years without voting;

41,336 registrations were registered while voter rolls were closed for the 2022

General Election;

439 registrations were backdated;

887 registrations were for individuals older than 110 (the age of Florida's oldest

known person);

507 individuals were registered to vote before the age of 16;

19,771 individuals were registered to vote on a Sunday;

20,213 individuals were registered to vote on a federal holiday; 12,912 voter

registrations contained an invalid name.

*See*, Exhibit "B" for a copy of United Sovereign American's Florida 2022 General Election

Validity Scorecard.

180.    This data shows that in 2022 the voter rolls in Florida were not accurate and

current as required by NVRA, HAVA, nor in conformity with specific Florida laws pertaining to

voter registration. 52 U.S.C.A. § 20501(b)(4); 52 US.C.A. § 21081; and Fla. Stat. § 97.012.

181.    Thus far, Petitioners have exhausted every remedy known to them in advance of

the 2024 general election to have these issues corrected. Petitioners continued in 2024 to seek

redress and repair for these egregious violations through democratic means.

182.    Respondents have dismissed, and continue to dismiss, Petitioners' concerns and,

based on information and belief, did so without any meaningful review, action, or response.

183.    Petitioners believe and therefore aver Respondents intend to administer and

ultimately certify Florida's 2024 general election (involving both state and federal contests) using

the same inaccurate and flawed data and conditions.

**B.  VOTES FROM INELIGIBLE VOTERS**

184.     Expert analysis on behalf of Petitioner United Sovereign Americans of the official Florida State Voter Registration Data for the 2022 election revealed that, out of the votes cast in the 2022 general election, there were a total of **208,204** evident voting violations, and **205,750** *unique* votes impacted by apparent voting violations.[7] These violations were in the form of:

77,063 voters had an invalid or incomplete address on their voter registrations;

3,042 voters had 10-15 voters registered at a single family home;

2,470 voters had 6-89 voters registered in a single apartment or lot;

6,867 voters had illegal duplicate registrations;

1,724 voters with double or more votes had illegal duplicate registrations;

51 voters registered after the 2022 General Election cutoff date – but still voted;

208 voters had backdated registrations;

3 voters were registered as being older than 110 (the age of Florida's oldest known person); 10,132 voters were registered on a Sunday;

12,207 voters were registered on a federal holiday;

7,844 voters had registrations with invalid names;

88,635 voters reported blank ballots;

42 voters voted twice.

*See* Exhibit "B" for a copy of Petitioner United Sovereign American's Florida 2022 General Election Validity Scorecard.

185.     Petitioners believe and therefore aver this data shows that in 2022 the voter rolls in Florida are not accurate and current as required by the NVRA, HAVA, and specific Florida laws

---

[7] Some registered voters have more than one violation. The number of unique voters indicates how many individual registrations have apparent errors – whether it be one or multiple apparent errors.

pertaining to voter registration. 52 U.S.C.A. § 20501(b)(4); 52 US.C.A. § 21081; and Fla. Stat. § 97.012.

186.     Thus far, Petitioners have exhausted every remedy known to them in advance of the 2024 general election to have these issues, and all issues raised below, addressed and remedied. Petitioners continued in 2024 to seek redress and repair for these egregious violations through democratic means.

187.     Respondents have ignored or dismissed, and continue to ignore or dismiss, these concerns without apparent meaningful review, action, or response, and furthermore Petitioners believe and therefore aver Respondents intend to administer and certify Florida's 2024 general election (involving both state and federal contests) under the same inaccurate and flawed conditions as that have utilized previously in conducting Florida's combined federal and state elections.

## C.  ERROR RATES IN 2022 COMPARED TO RATES PERMITTED BY FEDERAL LAW

188.     Florida's voting systems are subject to the permissible error rates set forth by Congress in HAVA and further elucidated in FEC Voting System Standards 3.2.1 and explained in the EAC's VVSG. *Supra*.

189.     The *maximum* number of apparent voting system errors permissible in counting votes in the 2022 Florida General Election using the calculations set forth by the Federal Election Commission upon mandate by Congress was sixty-three (63) errors at most allowed. The total number of Unique Ballots impacted by voting system errors in the Florida General Election, however, was 208,024 apparent errors. *See* Exhibit "B."

190.     Even accounting for the possibility that of the 208,024 apparent errors, many were not true errors, Petitioners believe and therefore aver, the state cannot reduce that number to sixty-

three (63) or less.

191.     Under HAVA, an error rate of no more than one in 125,000 is permissible before the results of the *entire election* becomes suspect, and the integrity and reliability of the election compromised.  As mentioned above, this figure is calculated by dividing the total number of Florida votes in a given election by 125,000, to arrive at the number of permissible errors in any given election in order to create the error rate of no more than one in 125,000 mandated by the VVSG.

192.     For the 2022 General Election this is 7,796,916 (votes cast) divided by 125,000 leaves sixty-three 63 (rounded up) as the maximum errors permitted, meaning that in order for the election to be considered valid, there cannot have been more than 63 voting system apparent errors in the entire ballot tabulation for all ballots cast in that election in Florida.

193.     However, in the 2022 Florida General Election, the number of voting system apparent errors in counting ballots for the 2022 general election was 208,024, a figure dramatically exceeding the maximum allowable apparent error rate of sixty-three (63).

194.     Because the voting system apparent error rate for the 2022 Florida General Election was far above the maximum allowable error rates, Petitioners believe and therefore aver the reliability and credibility of the 2022 results are cast into doubt as a matter of law.

## VOTER-TO-VOTE DEFICIT

195.     The official canvas for the 2022 Florida Election was 7,651,607 ballots cast yet the data shows there exist 7,796,916 total votes cast – a discrepancy of 145,309 votes. *See* Exhibit "B."

196.     This discrepancy can best be defined as a Voter-to-Vote deficit.

197.     Additionally, the official canvas for the 2022 Florida Election was 7,796,916 votes (ballots counted) yet there exist only 7,651,607 *voters who actually voted* according to the data provided – a discrepancy of 145,309 votes that are completely unaccounted for and cannot be explained—a number far in excess of sixty-three (63) and indisputably each constitution an "error."

198.     Petitioners believe and therefore aver that the **145,309 more votes counted than voters who voted** means that either tabulators overcounted votes statewide, or there is an alternative source of the data discrepancy.[8]

### D.  FLORIDA'S 2022 GENERAL ELECTION VALIDITY

199.     For Florida's 2022 General Election, out of the 15,742,645 total registrations, of which Petitioners believe and therefore aver, there were 15,176,814 *valid* registrations, 114,266 uncertain/illogical/invalid registrations, 293,605 registrations which violated election laws, and 157,960 "Deadwood" registrations.[9] *See* Exhibit "C."

200.     Petitioners believe and therefore avers that of the people holding the 15,176,814 valid registrations, 7,573,512 votes were counted in the 2022 General Election.

201.     Petitioners believe and therefore avers that of the identified 114,266 uncertain/illogical/invalid registrations, 39,946 people voted and had their votes counted in the 2022 General Election.

202.     Petitioners believe and therefore avers that of the 293,605 registrations that violated election laws, **38,149** people holding such registrations *cast votes that were counted* in the 2022

---

[8] Petitioners accuse no one of engaging in fraud or deceit.  Petitioners merely point out the discrepancy, which could be due to unintentional tabulator error, some fraud of unknown origin, a combination of both, or even fraud by the tabulators themselves. The discrepancy occurred in 2022 for an unknown reason.  It is the deficit *itself*, regardless of the cause, that demonstrates an error rate in excess of that permitted by HAVA calling into question the integrity of the election.  Petitioners propose to ask this Court to order Respondents to ascertain why the deficit occurred in 2022, ensure that a similar deficit does not re-occur in 2024, and in all federal elections thereafter in the future.

[9] "Deadwood" is a concept dealing with election fraud and is defined as a fake voter registration record. These registrations could include a voter who is deceased, ineligible, moved, etc.

General Election.

203.    Petitioners believes and therefore avers that while none of the 157,960 "Deadwood" registrations, or fake name registrations, are listed as having voted in the 2022 General Election, those registrations exist and thus *could* be utilized fraudulently in future elections.

204.    Petitioners believe and therefore avers that the *registration* error rate in Florida for the 2022 General Election was **two-and-eighty-six-hundredths (2.86%)** of the total registrations on the state's voter rolls.  This figure is arrived at by taking 114,266 uncertain/illogical/invalid registrations, plus 293,605 registrations which violated election laws, as a percentage of 15,742,645 total registrations.

205.    Petitioners believe and therefore avers that the *voter* system error rate in Florida for the 2022 General Election was **three-and-forty-nine-hundredths (3.49%)**, arrived at by taking 39,946 votes counted from uncertain/illogical/invalid registrations, plus 38,149 votes counted from illegal registrations, as a percentage of 7,651,607 votes cast.

206.    For example, the margin of victory in FL Congressional District 94 in 2022 was one-and-eight-tenths percent (1.8%), or 41,220 votes to the winner and 28,062 votes to the loser. The apparent error rate statewide in the 2022 federal election when applied to the Congressional Election in FL District 94 exceeds the margin of victory for this particular congressional district, meaning that if the apparent error rate in Florida is evenly distributed by Congressional District (which *ordinarily might* be a reasonable assumption given that such districts must contain roughly the same number of people under the Constitution), the Congressional Election results in District 94 election would be considered unreliable.[10]  That is not to say that the eventual "winner" there did

---

[10] This is merely a simplified example for illustrative purposes as Petitioners are aware that the apparent error rates are not

not receive more votes than the eventual "loser." It simply means if the apparent error rate is assumed to be evenly distributed throughout Florida, the winner in the 94th cannot be *confident* in his/her election, and the loser cannot be *confident* in his/her defeat *because the election itself* would not have produced results according to law that are reliable, meaning the integrity of the entire election process is called into question.

207.    Per HAVA and the FEC, the legal standard of allowable registration errors for a federal election is 0.0008% (or 1 out of 125,000) yet the voter system error rate in Florida's 2022 combined state and Federal General Election was 6.35%.

### Requested Relief
### ALL WRITS ACT RELIEF – 28 U.S.C. § 1651

206.    Petitioners incorporate the previous paragraphs by reference as if set forth at length here.

207.    Petitioners are not seeking to undermine official elections results previously certified. Petitioners have cited issues in prior Florida federal elections to add weight to Petitioners' belief that absent intervention by this Honorable Court, Respondents will permit the same apparent errors to occur in the 2024 General Election in Florida, and in all following federal elections in the state.

208.    Petitioners seek redress from the constitutional harm brought upon them, and the Florida electorate at large, by Respondents failure to comply with federal and state election law.

209.    Petitioners believe and therefore aver that Respondents have done nothing or an inadequate job at addressing the issues presented in this Petition – particularly to address the

---

evenly distributed county-by-county and thus cannot be evenly distributed by congressional district. For a county-by-county breakdown from highest to lowest apparent error rate by total numbers please see Exhibit "D" demonstrating which Florida counties account for the greatest number of errors by total number.

inaccurate and likely fraudulent voter rolls and voter systems used in federal elections conducted by state authorities.

210.    Respondents' inaction and/or failure to act compels Petitioners to ask that the Court to issue a Writ of *Mandamus* requiring Respondents to comply with the two federal statutes at issue (the NVRA and the HAVA) along with the Florida Election Law, Fla. Stat. Chapters 97-107, while giving Respondents a reasonable time within which to bring Florida into compliance in time for the 2024 General Election and all federal elections conducted by the State of Florida going forward while providing relief to 2024 voters if bringing the State of Florida into compliance in time is impossible upon showing by Respondents.

211.    Specifically, Petitioners respectfully seek that the Court order Respondents take steps, both short term and long term, to ensure the apparent errors made during the 2022 elections do not recur and to bring the State of Florida into compliance with HAVA's specific mandate of no greater than 1 voting error out of 125,000 votes.

212.    This Honorable Court is authorized to issue a writ of *mandamus* under "The All-Writs Act," 28 U.S.C. § 1651 granting the power to United States Federal Courts to "issue all writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law."

213.    A writ of *mandamus* under 28 USC § 1651 is typically used to fill gaps in the law, and the Supreme Court has stated that The All-Writs Act is a "legislatively approved source of procedural instruments designed to achieve 'the rational ends of the law.'" *Harris v. Nelson*, 394 U.S. 286 (1969) (All Writs Act *mandamus* properly used to conduct factual inquiries).

214.    A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is

appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (*quoting Cheney v. United States Dist. Ct.*, 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law)).

215.    A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that the petitioner has established has a clear legal right to have the governmental agency or official, in this case Respondents, perform.

216.    A federal court may use all auxiliary writs as aids when it is "calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it." *Adams v. United States*, 317 U.S. 269, 273 (1942) (writ of *habeas corpus* is available to the circuit courts of appeals).

217.    A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

218.    "Mandamus is employed to compel the performance, when refused, of a ministerial duty . . . [i]t also is employed to compel action, when refused, in matters involving judgment and discretion, but not to direct the exercise of judgment or discretion in a particular way nor to direct the retraction or reversal of action already taken in the exercise of either." *Wilbur v. United States*, 281 U.S. 206, 218 (1930). *See also Decatur v. Paulding*, 39 U.S. 497, 514-17 (1840) (Secretary of the Navy's duty to approve of pensions was discretionary, and therefore, not ministerial); *Kendall v. United States*, 37 U.S. 524 (1838) (Postmaster General had a ministerial duty to make entries); *Work v. Rives*, 267 U.S. 175, 177 (1925).

219.    Instantly, Petitioners have no other remedy than a writ of *mandamus*.

220.    Petitioners argue that injunctive and/or declaratory relief is inapplicable or

inappropriate in this issue because the harm from the 2024 election is not yet realized and Petitioners are seeking to have Florida election officials and/or federal officials bring the State of Florida into compliance with federal and state law, specifically HAVA, NVRA, and the Florida Election Law, Fla. Stat. Chapters 97-107, absent a specific existing private cause of action Petitioners could assert that affords Petitioners relief.

221.    Petitioners believe and therefore aver Respondents have allowed, and continue to allow, violations of federal election laws, Florida election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems. 52 US.C.A. § 20501; 52 US.C.A. § 21083.

222.    Petitioners believe and therefore aver that the voter rolls within the State of Florida are inaccurate, in violation of NVRA and HAVA. These are not list maintenance failures. The inaccuracies represent a failure to control the process of validating and registering only qualified citizen voters. These apparently invalid and/or illegal registrations voted in large numbers in Florida's 2022 General Election.

223.    Petitioners believe and therefore aver the Respondents have lost control of voter registration, leading to the distribution of ballots to what appear to be false registrants which results in a diluted vote and further harm to petitioners and the electorate at large. The voter-to- vote deficit is illustrative here in that the official canvas for the 2022 Florida Election was 7,651,607 votes yet there exist 7,796,916 total votes in the data – a discrepancy of 145,309 votes. Upholding HAVA includes the risk assessments and proper certification of all system elements individually, and as a system as a whole.

224.    Petitioners believe and therefore aver an election official's job is fidelity to the law

in administering the electoral process, thereby protecting the integrity of an election, and the citizens from corruption in the election process.

225.    Petitioners believe and therefore aver that Florida officials' failure to follow the law has resulted in election outcomes that are untrustworthy. The voting system in its present form cannot be used to produce trustworthy reliable results without the requested judicial intervention.

226.    Petitioners believe and therefore aver a writ of *mandamus* is appropriate in this case. Respondents have failed, and continue to fail, in complying with federal and state laws regarding voting – including voting accuracy and accountability. It is clear from the Respondents conduct before, during, and after, the 2022 elections that, absent judicial action, Respondents will do nothing to repair the deficiencies noted above to ensure the integrity of Florida elections are conducted in compliance with federal and state law.

227.    The scope of Petitioners' *mandamus* request is narrow: Petitioners seek this Court to order Respondents follow existing federal and state law designed by Congress and the Florida General Assembly to ensure that Florida's 2024 and subsequent combined federal and state general elections produce reliable results within the margin of error rate allowed.

228.    Petitioners hold up the mathematically unreliable (according to, *inter alia*, HAVA) 2022 Florida combined federal and state General Election as evidence that, should the writ not issue, the apparent error rate in the 2024 and subsequent combined general elections will continue to exceed the law's mandated maximum error rate permitted before an election is unreliable.

229.    Petitioners seek that the requested writ direct Respondents to investigate and remedy the issues exposed in the 2022 elections to avoid repeating the same mistakes in future combined federal and state general elections which are constitutionally administered by Florida pursuant to Article I, Section 4 (delegating to the state legislatures the power to regulate federal

elections for members of the House of Representatives, with Congress reserving the power to "…alter such Regulations [made by the various state legislatures]…"),[11] and, generally, Article II, Section 1 (granting state legislatures the power to determine how presidential electors are chosen) of the United States Constitution.[12]

230.    Petitioners believe and therefore aver that since the Constitution reserves to Congress the *ultimate* (as opposed to the *presumptive*) power to regulate the means by which Congress' own members are chosen, while the Constitution simultaneously delegates the presumptive power to regulate such elections to, in this case, the General Assembly of the State of Florida to further delegate as it sees fit to do so by law, the Respondents who are not federal officers *per se*, become federal officers by agency requiring them to carry out not only Florida election law, but additionally to carry out federal election statutes passed by Congress and duly signed into law by the President under Congress' ultimate authority laid out in Article I, Section 4.

231.    Petitioners believe and therefore aver that delegations of authority by the General Assembly of powers to supervise federal elections to any Respondent State of Florida officials pursuant to the General Assembly's power to regulate federal elections granted by Article I, Section 4, makes the State of Florida Respondents into federal officers by agency or quasi- federal officials

---

[11] Petitioners aver that NVRA and HAVA are examples of Congress' exercising its power under Article I, Section 4 to "alter" Florida's (and all other state's) otherwise absolute constitutional authority to regulate federal elections to the House of Representatives and, by application of the 17th Amendment to the U.S. Constitution providing for the direct election of two senators from each state, Congress may exercise its authority "…from time to time by Law make or alter such Regulations…" [of the various states…] to regulate the election of United States Senators as well the election of members of the House of Representatives.

[12] Petitioners include citation to Article II and the choosing of electors for president and vice-president, (later modified by the 12th Amendment), to again demonstrate the Framers' intent that the various states shall have presumptive authority to regulate and administer the election of all federal officers on the ballot for consideration in a federal election.  Article 1, Section 4 (as later amended) and Article II, Section (as later amended) are examples of where the Framers intentionally intertwined the powers of the various states with those of Congress, while making certain Congress maintained the *ultimate* power to regulate the election of its members, the then-prevailing concepts of *Federalism* and *Dual Sovereignty* notwithstanding.

in the carrying out of their duties to regulate federal elections.

232.    Petitioners believe and therefore aver that ordinary principles of federalism and dual sovereignty where a Federal District Court Judge would be reluctant to issue an order to a Florida State official pertaining to how that state official may perform his/her official functions are inapplicable because the Respondent State official is acting in his/her hybrid role as a quasi-federal officer as required by Article I, Section 4.

233.    Petitioners believe and therefore aver, then, that this Honorable Court has authority to issue the requested writ of *mandamus* to compel, not just the Respondent Federal officers to ensure that federal election law is carried out in Florida's 2024 and subsequent general elections, this Court also has the authority to compel Respondent State officials because said officials are charged by the U.S. Constitution in the carrying out of federal law where Congress has asserted its power to "alter" existing Florida federal election procedures as it did in enacting NVRA and HAVA.

234.    Petitioners believe and therefore aver that any delegation from the Florida General Assembly to the Executive Branch of Florida government (e.g., to the Governor who in turn delegates power to the Secretary of State, or any delegation of the General Assembly's power to regulate federal elections to the Attorney General) still falls under this Court's authority which is derived through Article I, Section 4's grant to the various state legislatures of the power to supervise federal elections.

235.    Petitioners believe and therefore aver that simply because the General Assembly may have chosen to delegate some of its authority to supervise federal elections to Respondent members of the State of Florida's Executive Branch of government, such delegation does not insulate such officials from the power of this Court, since this Court's power comes from its authority over the delegating entity, in this case the Florida General Assembly.

**ACTION TO COMPEL AN OFFICER OF THE UNITED STATES TO PERFORM HIS DUTY – 28 U.S.C. § 1361**

236.     Petitioners incorporate the previous paragraphs as if set forth at length here.

237.     District Courts are empowered with the ability to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff. 28 U.S.C. § 1361.

238.     Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice are parties responsible for the enforcement of federal election laws, specifically HAVA and NVRA.

239.     Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice are officers, employees, or an agency of the United States.

240.     Petitioners believe and therefore aver that Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice, have done nothing, or, at best, an inadequate job at addressing the issues presented above – namely, the inaccurate and likely fraudulent voter rolls and systems within Florida.

241.     The inaction and/or failure to act is harming Petitioners and the Florida electorate at large warranting that the Court issue a Writ of *Mandamus* compelling Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice to enforce and police the two federal statutes at issue (NVRA and HAVA) for implementation in the Florida 2024 General Election and subsequent combined federal and state elections administered by the State of Florida officials and giving Respondents a reasonable period of time in which to do so.

242.     Specifically, the Court should order Respondents to take preventative measures to see the apparent errors evident the 2022 elections are not repeated in the 2024 and subsequent

elections and bring the State of Florida into compliance with HAVA's specific mandate of no greater than 1 voting error out of 125,000 votes to ensure reliable election results as HAVA intended.

243.     A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010)(quoting *Cheney v. United States* Dist. Ct., 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law).

244.     A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that the petitioner has established has a clear legal right to have the governmental agency or official, in this case Respondents, perform.

245.     A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

246.     Relief contemplated under statute providing that federal district courts shall have original jurisdiction of any action in nature of mandamus to compel an officer or employee of United States or any agency thereof to perform a duty owed to plaintiff is at least as broad as under common-law writ of mandamus. *Carey v. Local Bd. No. 2, Hartford, Conn.*, 297 F.Supp. 252 (D. Conn. 1969), aff'd, 412 F.2d 71 (2d Cir. 1969).

247.     Petitioners believe and therefore aver they have no other remedy than a writ of *mandamus* and to compel an officer or employee of the United States or any agency thereof to perform a duty owed to plaintiff/petitioner.

248.     Petitioners argue that an injunctive and/or declaratory relief is inapplicable or

inappropriate in this issue because the harm from the 2024 election is not yet realized and Petitioners are seeking to have Florida election officials and/or federal officials bring the State of Florida into compliance with federal and state law, specifically HAVA, NVRA, and the Election Code, absent a specific private cause of action that affords Petitioners relief.

249.    Petitioners believe and therefore aver Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice have allowed, and continue to allow, violations of federal election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems.

250.    Petitioners believe and therefore aver the voter rolls within the State of Florida are inaccurate, in violation of NVRA and HAVA. That these are not list maintenance failures. Instead, the inaccuracies represent a failure to control the process of validating and registering only qualified citizen voters. Persons voted in the Florida 2022 General Election in significant numbers who held apparently invalid and/or illegal registrations.

251.    Petitioners believe and therefore aver that Respondents' failure to follow the law, or enforce the law, has resulted in election outcomes that are untrustworthy and unreliable. Florida's voting system in its present form cannot be trusted to produce reliable results under HAVA, because Respondents will not follow the dictates of the Act necessitating judicial intervention.

252.    A writ of *mandamus* against Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice is appropriate in this case. Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice have failed, and continue to fail, in forcing the State of Florida to comply with federal laws regarding voting – including voting

accuracy and accountability as is clear from how the 2022 Florida General Election was conducted.

253.     Petitioners believe and therefore aver that without judicial action, Respondents will do nothing to comply with HAVA and other federal and state statutes to ensure the integrity of Florida's elections and the same issues evident from the 2022 General Election will call into question the validity of Florida's 2024 General Election results.

254.     The scope of this request for a writ of *mandamus* is narrow: Petitioners seek a judicial order requiring Respondents both federal and state to follow the laws cited herein in conducting the 2024 and subsequent federal elections, and adequately investigate and remedy the problems exposed in and 2022 elections and detailed above.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners respectfully request Your Honorable Court formally recognize Florida's voter registration rolls contained hundreds of thousands of apparent errors in the 2022 General Election. Further, that these apparent errors took the form of registrations with invalid addresses, registrations from a single family homes with 10-15 people registered to it, registrations from a single apartment or lots with 6-89 people registered to them, illegal duplicates, registrations that were inactive with 8 or more years without voting, registrations while voter rolls were closed for the 2022 General Election, backdated registrations, age discrepant registrants, registrations on Sundays and federal holidays, and registrants with invalid names. Petitioners ask this Court to enter an order in *mandamus* compelling Respondents to ministerially correct the apparent errors evident from the 2022 elections data, ascertain to the Court's satisfaction the reasons why the 2022 errors occurred, and prevent those same or similar ministerial errors from recurring during the Florida 2024 General Election and all subsequent federal general elections to ensure the integrity of Florida's

combined federal and state elections going forward for years to come.  Petitioners, additionally, seek pursuant to permissible causes of action under NVRA and HAVA, this Court order that the State of Florida may not certify the 2024 General Election unless and until the relevant Respondents have demonstrated to the Court that the 2024 General Election and subsequent elections were conducted in conformity with federal and state law and with fewer than the maximum errors permissible. **Petitioners further request this Honorable Court order the state, and any subdivision thereof responsible for voter registrations, submit voter registration requests (and any existing registrations reasonably in question) to the Department of Homeland Security to verify the citizenship or immigration status of persons seeking registration to vote or who are presently on the state's voter rolls whenever there exist any reliable indicators that an applicant or registered voter may not be a U.S. citizen. (*see*: 8 U.S.C. secs.1644 & 1373(c)).** Lastly, Petitioners seek and order in *mandamus* requiring all public officials named as Respondents perform their duties as the law intended whether it be conducting federal elections in conformity with the law or investigating, and where warranted in their discretion, prosecuting persons or entities for failing to perform their duties in conformity to the law after being given timely notice to do so.

Respectfully Submitted,

**van der Veen, Hartshorn, Levin, & Lindheim**

Date: August, 27, 2024                        By:      */s/ Bruce L. Castor, Jr.*
                                                                   Bruce L. Castor, Jr.
                                                                   PA I.D. No. 46370
                                                                   Michael T. van der Veen
                                                                   PA I.D. No. 75616
                                                                   *Attorneys for Petitioners*

                                                                   1219 Spruce Street
                                                                   Philadelphia, PA 19107

Main: (215) 546-1000
Fax: (215) 546-8529
Email: bcastor@mtvlaw.com
Email: mtv@mtvlaw.com